**Judith ROSSNER and Miriam Gibbon, as Trustee of Trusts for the Benefit of Jean Rossner and Daniel Rossner, Plaintiffs,**

v.

**CBS, INC., Grosso-Jacobson Productions, Inc. and Paramount Pictures Corporation, Defendants.**

**No. 83 Civ. 7543 (LFM).**

United States District Court,
S.D. New York.

July 1, 1985.

Squadron, Ellenoff, Plesent & Lehrer, New York City, for plaintiffs; Howard M. Squadron and Eugenie C. Gavenchak, New York City, of counsel.

Ronald E. Guttman and Douglas P. Jacobs, New York City, for defendant CBS,

Inc.; Laura V. Jones, New York City, of counsel.

Pryor, Cashman, Sherman & Flynn, New York City, for defendant Grosso-Jacobson Productions, Inc. and Paramount Pictures Corp.; Steven F. Huff and Tom J. Ferber, New York City, of counsel.

MacMAHON, District Judge.

This is an action for injunctive relief and damages brought by Judith Rossner (Rossner) and Miriam Gibbon (Gibbon), as trustee of trusts for the benefit of Jean Rossner and Daniel Rossner, against CBS, Inc. (CBS), Grosso-Jacobson Productions, Inc. (Grosso-Jacobson), and Paramount Pictures Corporation (Paramount). The action was tried before us, without a jury, on March 25, 26, 27 and 28, 1985.

Plaintiffs seek to enjoin defendants permanently from using the word "Goodbar" as part of a title for a made-for-television movie entitled *Trackdown: Finding the Goodbar Killer (Trackdown)*. Alleging that defendants' use of the word "Goodbar" constitutes a false designation of origin, plaintiffs claim violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a) (1946), unfair competition and violation of N.Y.General Business Law § 368-d (McKinney 1984). Alternatively, asserting that *Trackdown* is a sequel to the movie *Looking for Mr. Goodbar (Goodbar* movie), plaintiffs seek $75,000 in damages from Paramount for alleged breach of a contract which required Paramount to pay Rossner that sum upon the production of any sequel to the *Goodbar* movie.

Plaintiffs also seek a permanent injunction directing defendants to broadcast a consent-ordered disclaimer with the credits of *Trackdown* during any future showing of the movie. Finally, plaintiffs seek compensatory damages, punitive damages, and attorneys' fees against all defendants.

## JURISDICTION

We have subject matter jurisdiction of the federal claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) and (b) and pendent jurisdiction of the state claims.

## THE PARTIES

Plaintiff Rossner, a celebrated novelist, is a resident of New York. Defendant Grosso-Jacobson, a Delaware corporation with its principal place of business in New York, is an independent producer of movies primarily for broadcast on network television. Defendant CBS, a New York corporation with its principal place of business in New York, operates the CBS television broadcasting network. Defendant Paramount, a Delaware corporation with its principal place of business in California, is a major motion picture studio.

## FACTS

After carefully considering the exhibits, hearing and observing the witnesses, and weighing all the evidence and the arguments of counsel, we find the following facts:

Roseann Quinn (Quinn), a twenty-eight year old school teacher, was brutally murdered in her apartment on the upper west side of Manhattan on January 1, 1973. The police apprehended and charged John Wayne Wilson (Wilson), a man whom Quinn had picked up in a singles' bar, with the murder. Both the murder and the ensuing investigation were extensively reported in the local newspapers.

Rossner read the reports and, sometime later, commenced writing a novel about a school teacher who is murdered by a man she meets in a singles' bar. The novel is not a factual account of the Quinn murder, but the characters and the events depicted are loosely based on the actual murder.

Rossner entitled her novel *Looking for Mr. Goodbar (Goodbar* novel). It was published by Simon & Schuster, Inc. in June 1975 and generated wide critical acclaim and popular success, selling approximately 133,000 copies in hardcover editions and 3,609,059 in paperback and appearing on best-seller lists for twenty-seven weeks.

On July 1, 1975, Rossner and Gibbon, along with another trustee, entered into an

agreement with Paramount (Paramount Agreement), whereby Rossner granted and assigned to Paramount "the sole and exclusive rights" to use the *Goodbar* novel, its title, and any similar title "in the making of motion picture photoplays" based upon the novel (Paragraph Second, Paramount Agreement). Pursuant to the agreement, in 1977, Paramount released a movie entitled *Looking for Mr. Goodbar*, which was based on the *Goodbar* novel.

Two years earlier, in October 1975, Lacey Fosburgh (Fosburgh), the reporter who covered the Quinn murder for *The New York Times*, wrote an article about the murder entitled *Finding Mr. Goodbar*, which was published in *New Times* magazine. A similar Fosburgh article entitled *Finding the Real Mr. Goodbar* was published in *Cosmopolitan* magazine in June 1976. The *New Times* issue had a circulation of approximately 214,269 and the *Cosmopolitan* issue 2,221,623. Subsequently, Fosburgh wrote a novel based on the Quinn murder entitled *Closing Time: The True Story of the "Goodbar" Murder*, which was published by Dellacorte Press in 1977. Over 118,116 copies of the novel were sold.

At trial, Rossner testified that she was aware of these publications and of Fosburgh's continued use of the word "Goodbar" in their titles. Nevertheless, she decided not to take any legal action against Fosburgh because she found Fosburgh's titles to be sufficiently distinguishable from her own work.

As a result of the extensive awareness of Rossner's novel, its reviews, the Fosburgh publications, and the Paramount movie, the media has referred to the Quinn murder as "the Goodbar murder" and to Wilson as "the Goodbar killer." There is also some evidence that the word "Goodbar" has entered the vernacular as a word describing "the singles' scene" or a dangerous "pickup."

In April 1981, Grosso-Jacobson agreed to produce a two-hour made-for-television movie for CBS based on the Quinn murder investigation. It hired John Lafferty, the detective primarily responsible for the actual investigation, as a consultant. Although aware of Rossner's prior use of the word "Goodbar," executives at CBS insisted that the word "Goodbar" be part of the movie's title because they believed that it identified an actual murder known to the public and, therefore, would be an exploitable title. The movie, ultimately titled *Trackdown: Finding the Goodbar Killer*, was broadcast on CBS at 9:00 P.M. on October 15, 1983.

Upon learning that *Trackdown* was in production, Rossner directed her agent to advise Paramount to protect its movie rights in the title "Looking for Mr. Goodbar." Paramount then wrote to CBS and Grosso-Jacobson claiming infringement of its rights to use of the word "Goodbar." They countered that the term "Goodbar Killer" was in the public domain as a result of the media's and Fosburgh's use of the term to identify Wilson.

After negotiations, Paramount, CBS, and Grosso-Jacobson and its umbrella insurance company, Centerpoint Productions, Inc., entered into an agreement dated March 15, 1983 (March 15 Agreement). Under the agreement, Paramount waived its right to object to the use of the word "Goodbar" in the *Trackdown* title provided that (1) the word would not be emphasized in the title, (2) the movie would be a factual account of the Quinn murder, and (3) the advertising would not refer to the movie as a sequel or as otherwise derived from the *Goodbar* novel or the *Goodbar* movie.

On October 14, 1983, plaintiffs moved, by order to show cause, for a preliminary injunction preventing the exhibition of *Trackdown*, alleging, *inter alia*, unfair competition and false designation of origin. After a hearing, this court (Edelstein, J.) issued a consent order which provided:

> "that the defendants' broadcast of the movie 'Trackdown: Finding the Goodbar Killer,' will contain at its beginning and at its end for three-four seconds the attached disclaimer displayed in written form on the screen."

The language of the disclaimer agreed to by the parties was as follows:

> "The following broadcast is based on fact. It is not related to the Judith Rossner novel 'Looking For Mr. Goodbar,' and Miss Rossner has no connection with it."

The consent order implicitly incorporated the parties' agreement that the disclaimer would appear with the beginning and closing credits of *Trackdown*. The following evening, however, when CBS broadcast *Trackdown*, the disclaimer did not appear with the movie's credits but among commercials at the beginning and closing of the program hour.

## DISCUSSION

We emphasize, at the outset, that plaintiffs are not bringing an action in copyright. Nor are they claiming that the characters, plot, themes or events portrayed in *Trackdown* infringe on the *Goodbar* novel. Their claim is simply that defendants, through their use of the word "Goodbar" in the title of *Trackdown*, are trading on Rossner's reputation and good will generated from the success of her novel. The claim arises from the fact that it was Rossner who, by virtue of her creative ability, first conceived of and used the word "Goodbar" to identify a fictionalized character in her novel.

### Standing

Defendants' first contention is that Rossner lacks standing to claim misappropriation of title because she assigned all of her right to use of the title *Looking for Mr. Goodbar* in motion pictures to Paramount. Paragraph Second of the Paramount Agreement provides, in pertinent part, that Rossner assigns and grants to Paramount:

> "the sole and exclusive rights: to use ... the title ... in the making of motion picture photoplays ... (it being expressly understood ... that [Paramount] agrees not to use said title *except in connection with any motion picture photoplay ... based, at least in part, upon [Rossner's] work* ) ... (emphasis added)."

The agreement also provides that Rossner retains all rights in her work which are "not ... specifically granted" to Paramount. (Paragraph Nineteenth, Paramount Agreement.)

 It appears that what Paramount essentially acquired from Rossner is the right to use her title in the making of motion pictures derived, to some degree, from her novel. Consequently, Rossner argues, and we agree, that from the bundle of literary property rights, she has retained that fraction of a right which allows her to use the title in movies not derived from her novel. This concept of fractional ownership is elusive. Nevertheless, after a careful reading of the Paramount Agreement, in light of the parties' intentions, we are convinced that Rossner has retained a small, but protectable interest which is at stake in this litigation. Specifically, she holds a right to protect against the unauthorized use of the title in motion pictures not based on her novel, and defendants themselves assert that Trackdown is not based on the *Goodbar* novel. We therefore conclude that she has standing to bring the instant action.

### Lanham Act

Plaintiffs' initial claim is that defendants' use of the title *Trackdown: Finding the Goodbar Killer* for their movie constitutes a false designation of origin, in violation of the Lanham Act, 15 U.S.C. § 1125(a) (1946). Section 1125(a) provides, in pertinent part:

> "Any person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

The Act has been construed to protect the title of a creative work when (1) the title has acquired "secondary meaning," *i.e.*, the

public identifies the title with Rossner and her work, and (2) there is a "likelihood of public confusion," *i.e.*, the public will be mislead into believing that defendants' work originated or is sponsored by Rossner because both works bear similar titles.[1]

■ The test of secondary meaning for literary titles is essentially one of establishing whether, in the minds of a significant number of the public, the title is associated with a single source of the literary work.[2] Since defendants have not used Rossner's entire title, but only the word "Goodbar," plaintiffs must demonstrate secondary meaning in the word itself. The question for us then becomes whether the public associates the word "Goodbar" with a single, though possibly, anonymous source.[3]

The advertisements, reviews and other press clippings relating to the *Goodbar* novel indicate that the word "Goodbar" was associated with Rossner when her novel first came into the public eye. The "strength" of the word as a trademark, however, has been diminished by the subsequent use of the mark to identify other sources.

First, Rossner sold her rights to the *Goodbar* title for use in motion pictures to Paramount. Paramount then produced the *Goodbar* movie and the word "Goodbar" became associated with Paramount and its movie. Second, Fosburgh wrote two articles and a book which prominently used the word "Goodbar" in their titles and identified Wilson as the "Goodbar Killer." Several newspaper articles reinforced this association in the minds of the public by referring to the Quinn murder as the "Goodbar murder" and to Wilson as the "Goodbar Killer." Finally, the word itself has been used in the vernacular, specifically, in other movies, television programs and news articles, to identify the "singles' scene," "a dangerous pick-up" or "Mr. Right."

■ "The strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded."[4] The strength of the "Goodbar" mark refers to its ability to identify a work sold under the mark as emanating from a particular source, namely, Rossner. Although Rossner is "not required to act immediately against every possibly infringing use [of her mark] to avoid a holding of abandonment," her failure to police the mark has inevitably caused the mark to lose its primary significance as a source-denoting mark.[5] The frequent and disparate uses of the word "Goodbar" in association with Paramount, Fosburgh and the Quinn murder, prevent Rossner from demonstrating secondary meaning in her mark.[6]

Moreover, plaintiffs have presented no evidence that the public was mislead into believing that Rossner sponsored or was in any way involved in the production of *Trackdown*. Plaintiffs suggest that the various newspapers' "association" of *Trackdown* with the *Goodbar* novel is equivalent to confusion. More "association," however, is not sufficient to demonstrate a likelihood of confusion.[7] The ad-

1. See *Warner Bros. Pictures, Inc. v. Majestic Pictures Corp.*, 70 F.2d 310, 311 (2d Cir.1934); *National Lampoon, Inc. v. American Broadcasting Cos.*, 376 F.Supp. 733, 746–47 (S.D.N.Y.), *aff'd*, 497 F.2d 1343 (2d Cir.1974).

2. 1 J. Thomas McCarthy, Trademarks & Unfair Competition § 10:4 at 331–2 (2d ed. 1984).

3. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979).

4. *Id.* at 1131.

5. *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 766 (C.C.P.A.1982).

6. See *Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911, 925 (S.D.N.Y.1983), *aff'd*, 746 F.2d 112 (2d Cir.1984) (presence in the market of other unrelated producers with legally protected images that are very similar to plaintiffs' is fundamentally inconsistent with the requirement that the mark indicate to consumers a single source of origin); *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 333 (2d Cir. 1983).

7. See *Ideal Toy Corp. v. Kenner Products Division of General Mills Fun Group, Inc.*, 443 F.Supp. 291, 308 (S.D.N.Y.1977). *Accord, American Footwear Corp. v. General Footwear Corp.*,

vertising of CBS and Grosso-Jacobson frequently explained that *Trackdown* was based on the event that inspired Rossner's novel. Such statements are a means of accurately distinguishing Rossner's work to avoid confusion.[8]

To the extent that the viewers of *Trackdown* may have mistakenly believed that Rossner was associated with that film, the disclaimer, if it had been appropriately placed with the credits, is an adequate means of alleviating the viewers' confusion. "Disclaimers are a favored way of minimizing confusion as to source or sponsorship," and "[a]bsolute prohibitions of speech as provided for in [injunctive relief] are improper where there is any possibility that ... [a] disclaimer will suffice."[9]

The problem with the disclaimer here is that it was buried within the commercials shown before and after the movie. The record is somewhat confusing, but it was clearly the intent of the court to grant an order, on consent of all counsel, incorporating the agreement reached between the parties concerning the placement and form of the disclaimer. Plaintiffs' counsel described the agreement as follows:

> "If your honor please, we believe that we have an agreement, and I want to state what I understand to be clearly the agreement and what there may still be some question about it.
>
> We have agreed that there be a disclaimer accompanying this program whenever it appears, not only tomorrow night but thereafter, and *that disclaimer will appear with the credits in the same size as the credits.*
>
> \* \* \* \* \* \*
>
> We have insisted that the disclaimer appear with the credits at the beginning of the program saying, 'The following broadcast,' and at the end of the pro-

gram saying, 'The preceding broadcast.' (emphasis added)."

Defendants' counsel at no time objected to placing the disclaimer within the credits. We are compelled to conclude that defendants failed, in good faith, to comply with the intent of the order and agreement, and undermined the impact and the intent of the disclaimer.

*Unfair Competition and Anti-Dilution Statute*

■ Plaintiffs' claims under the New York common law of unfair competition and the anti-dilution statute are premised, as is their claim under the Lanham Act, on the contention that the public was deceived as to the origin of *Trackdown*. We recognize the breadth of New York's common law tort of unfair competition but emphasize that, in each instance, the tort results from the deception of the public as to the origin of a work. As stated earlier, we find that plaintiffs have failed to establish such deception or confusion.

Plaintiffs' reliance on Section 368–d of the New York General Business Law (McKinney 1984) is similarly misplaced. While confusion is not required under the statute, plaintiffs must demonstrate that they have a strong mark, and "there must be a blurring or tarnishing of the plaintiff's mark sufficient to constitute dilution."[10] Plaintiffs have failed to present any evidence that *Trackdown* has blurred or tarnished the "Goodbar" mark.

*Sequel*

Plaintiffs' alternative claim is that *Trackdown* is a sequel to the *Goodbar* movie and, thus, that Paramount owes Rossner $75,000 pursuant to the Paramount Agreement. Paramount contends that it did not license its sequel rights to Grosso-Jacobson or to CBS for the production of *Trackdown*, and, furthermore, that

---

609 F.2d 655, 663 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

**8.** *See Anti-Monopoly, Inc. v. General Mills Fun Group,* 611 F.2d 296, 301 n. 2 (9th Cir.1979), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

**9.** *Consumers Union of United States, Inc. v. General Signal Corp.,* 724 F.2d 1044, 1053 (2d Cir. 1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 100, 83 L.Ed.2d 45 (1985).

**10.** *Warner Bros. Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 248 (2d Cir.1983).

*Trackdown* is not a sequel to the *Goodbar* movie.

■ In the March 15 Agreement, Paramount agreed not to object to the use of the title *Trackdown: Finding the Goodbar Killer* for a movie which was a factual account of the Quinn murder investigation. Although defendants argue that this agreement is merely "a waiver of objection," it is, in essence, a covenant not to sue CBS or Grosso-Jacobson for their use of the word "Goodbar." Such a covenant has the practical effect of a license because it permits and induces the use of the word "Goodbar" in the title of *Trackdown* free from allegations of misappropriation.

Once we find that Paramount licensed its sequel rights, the question for us is whether *Trackdown* is a sequel to the *Goodbar* movie. Paragraph Seventeen of the Paramount Agreement provides that upon the commencement of the principal photography of any "sequel" to the *Goodbar* movie, which is longer than one and one-half hours, Paramount shall pay Rossner $75,-000. Paragraph 17(a) defines a "sequel" as a film:

> "in which the principal characters of the first feature length, theatrical motion picture produced hereunder participate in *an entirely new and different story* ... (emphasis added)."

Since the language of the agreement is clear and unambiguous, we must interpret its terms exactly as written.[11] By definition, then, whether a movie is a "sequel" under the Paramount Agreement depends on its content, not its title.

The *Goodbar* movie recounts the story of a lonely schoolteacher who frequents singles' bars in search of companionship. The last scene in the movie is a violent depiction of her murder by a man she met in one such bar. *Trackdown* begins where the *Goodbar* movie leaves off, with the murder of a young woman, and goes on to tell the "entirely new and different story" of the police investigation which leads to the final apprehension of her killer.

The "principal characters" in the *Goodbar* movie are Theresa Dunn, the schoolteacher; her father, her sister; James, her caring boyfriend; and Tony. Two other characters who appear in the movie, but only for a short duration, are the killer and the killer's homosexual lover. The only characters who are also found in *Trackdown* are the schoolteacher, the killer and his homosexual lover. Based on these three characters and the fact that the events in *Trackdown* logically follow those in the *Goodbar* movie, plaintiffs contend that *Trackdown* is a sequel to the *Goodbar* movie.

Initially, we note that the schoolteacher, the killer and his homosexual lover play relatively minor roles in *Trackdown*. Although the teacher's murder is the catalyst for the movie, the movie's primary focus is on the story of the detective, his investigation and his personal life. More importantly, even if these three characters were considered "principal characters," they are not taken from Rossner's fictionalized characters but from people involved in the Quinn murder.

Rossner may not have intended to model her characters in the *Goodbar* novel on actual persons. Nevertheless, her characters of Theresa Dunn, the victim, and Gary Cooper White, the killer, bear strong similarities to their real-life counterparts, Quinn and Wilson. Dunn, like Quinn, was Irish Catholic, taught deaf children, walked with a slight limp, and lived a fairly quiet and reserved life except for her attraction to singles' bars. White, like Wilson, was a young drifter with a pregnant wife in Florida and a homosexual lover in New York, had been in and out of jails, and had confessed to the brutal murder of a young schoolteacher whom he had picked up in a singles' bar.

We find that any similarities between the characters in *Trackdown* and those from Rossner's novel depicted in the *Goodbar* movie exist because Rossner drew fictional

---

11. *Glen Mfg. Inc. v. Perfect Fit Indus., Inc.,* 299 F.Supp. 278 (S.D.N.Y.1969), *remanded on other grounds,* 420 F.2d 319 (2d Cir.), *cert. denied,* 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970).

inspiration from an actual event and not because *Trackdown* is a sequel to the *Goodbar* movie. In *Greenbie v. Noble*, 151 F.Supp. 45, 65 (S.D.N.Y.1957), this court observed that:

> "The fact that two works relate to the same subject matter or are similar to one another does not constitute an infringement if each is the fruit of the author's independent intellectual effort. This is especially true when both works are derived from common sources and materials available to all so that the resemblances are either accidental or result from the nature of the subject."

Rossner cannot build a story and characters around an historical incident and then claim the exclusive right to use of the incident. Defendants have the right to avail themselves of the facts contained in Rossner's novel which relate to the Quinn murder and use such information in their movie.[12] "To avoid a chilling effect on authors who contemplate tackling an historical issue or event, broad latitude must be granted to subsequent authors who make use of historical subject matter...."[13] To the extent that Rossner's characters were "inspired" by actual persons, she cannot prevent the future depiction of these characters through the independent creative efforts of others.

We conclude that *Trackdown* was essentially a factual depiction of the Quinn murder investigation and, thus, is not a sequel to the *Goodbar* movie, as that term is defined in the Paramount Agreement.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, pursuant to Rule 52, Fed.R.Civ.P.

Accordingly, defendants CBS, Inc. and Grosso-Jacobson Productions, Inc. are permanently enjoined from broadcasting the movie *Trackdown: Finding the Goodbar Killer* without simultaneously broadcasting the consent-ordered disclaimer with the opening and closing credits of the movie. Plaintiffs' action is dismissed in all other respects. The parties are directed to settle a judgment and order containing a form of permanent injunction consistent with this opinion within twenty (20) days.

---

12. *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

13. *Id.*, 618 F.2d at 978.