Frederick W. HUGHES, as Executor of the Estate of Andy Warhol, Deceased, Andy Warhol's Foundation for the Visual Arts and Andy Warhol Enterprises, Inc., Plaintiffs,

v.

**DESIGN LOOK INCORPORATED, Defendant.**

No. 87 Civ. 9095 (RWS).

United States District Court, S.D. New York.

Aug. 5, 1988.

Richards & O'Neil, New York City, for plaintiffs; Paul J. Hanly, Jr., Jeffrey L. Coploff, of counsel.

Leonard M. Angus, Calabasas, Cal., for defendant.

## OPINION

SWEET, District Judge.

Plaintiffs Frederick W. Hughes, as executor of the Estate of Andy Warhol ("Hughes"), Andy Warhol's Foundation for the Visual Arts (the "Foundation"), and Andy Warhol Enterprises, Inc. ("Enterprises") (collectively "Plaintiffs") have moved pursuant to Rule 65(a), Fed.R.Civ.P., for a preliminary injunction against defendant Design Look, Incorporated ("Design Look"). Plaintiffs seek, by their motion, to enjoin defendants from producing a calendar containing twelve images created by Andy Warhol ("Warhol") but no longer owned by the Warhol Estate.

Although the Plaintiffs assert protection of these works under trademark, unfair competition and anti-dilution laws, the crux of the issue here is what, if any, rights can an artist assert over works that have been sold outright to third parties. This motion has ranged the interests derived from a famous artist, Warhol, against the interests granted by the owners of his works to a calendar maker who seeks to reproduce the images of the works. Under the present state of the law and the facts found here described below, the interests derived from the collector owner prevail over the interests which have devolved from the artist. Based on the findings of

fact and conclusions of law set forth below, the motion is denied.

*Prior Proceedings*

Plaintiffs brought this diversity action on December 21, 1987 seeking injunctive relief and damages for alleged acts of copyright infringement, trademark infringement, trademark dilution, unfair competition, misappropriation, invasion of the right of publicity and unauthorized alteration of works of art as a result of Design Look's promotion and intended sale of calendars displaying the works of Warhol.

The parties appeared before this court on January 29, 1988 pursuant to Plaintiffs' order to show cause for a preliminary injunction. At that hearing, the parties consented to an expedited discovery schedule, and Design Look undertook to refrain from publishing its proposed calendars until further order of the court.

As a result of negotiations between the parties, Plaintiffs withdrew their claim of copyright infringement. They are now proceeding under § 43(a) of the Lanham Act, § 368-d of the New York General Business Law, and common law principles of unfair competition.

This court received evidence at a hearing held on April 6, 1988 and the motion was submitted at that time.

*The Parties*

Hughes is a citizen of the State of New York and is the executor of the Last Will of Warhol, who died on February 22, 1987. Hughes is also the President of the Foundation, Enterprises and the magazine Andy Warhol's Interview. He was employed by Warhol as his business manager and exclusive agent for over twenty years.

The Foundation is a New York not-for-profit corporation and was formed pursuant to the Last Will of Warhol to support the visual arts in the United States and abroad. The Foundation will be funded in part by the assets of the Estate of Warhol.

Enterprises is a New York corporation wholly owned by the Estate of Warhol. Its chief asset is the magazine Andy Warhol's Interview.

Design Look is a corporation organized and existing under the laws of the State of California and qualified to do business in that state. Design Look is engaged in the publishing and marketing of calendars.

*Findings of Fact*

This dispute arises out of Design Look's proposed use of twelve works of the late Andy Warhol in a calendar entitled "Pop Art."[1] The defendants learned of Design Look's proposed use upon viewing a catalogue published by the latter for calendars to be distributed in 1989.

The business of Design Look, the sale of calendars, was commenced by its president Samuel Angus as a part time occupation while he was in college. It has since progressed to the point where its products are distributed by means of its calendar catalog. From the catalog orders are procured by sales representatives. Design Look sells to the consumer principally through bookstores, drug stores, gift stores, stationery stores, Hallmark shops, supermarkets, museums and art stores. Production commencing in the summer of 1988 will permit distribution in 1989. Design Look has already advertised its calendar, and, as of the date of the hearing in this case, had received approximately four-thousand orders. It had also, as of the date of the hearing, expended some $10,000 on producing a calendar that members of the public expect to receive.

Contained within the calendar catalog on pages 60-61 is a description of a calendar featuring the works of Warhol and accompanied by illustrations. The following images created by Warhol are contained in these promotional materials: "Marilyn Monroe" (1968); "Campbell Soup Series II (Hot Dog Bean)" (1968); "Campbell's Soup" (1965); "Self Portrait" (1966); "Green CocaCola Bottles" (1965); and "A Boy for Meg" (1961).

1. The calendar was originally to be called "Andy Warhol" but Design Look changed the title in response to discussions with defendants.

Subsequent to the production of the catalog, the parties met and discussed Design Look's proposed use of the Warhol images. As the result of these negotiations, Design Look later decided to use in its calendars only those works as to which neither the Estate nor the Foundation hold a copyright under the Copyright Act of 1909.[2] Design Look has identified the proposed works as: "Jackie III" (1966); "Electric Chair No. VII"; "Campbell's Soup Series II (Hot Dog Bean)" (1968); "A Boy for Meg" (1961); "Let Us Now Praise Famous Men" (1963); "Twenty-five Colored Marilyns" (1962); "Marilyn" (1968); "Self Portrait" (1966); "Campbell's Soup" (1965); "Green Coca-Cola Bottles" (1965); Untitled (from "10 Works—10 Painters") (1964) and "Campbell's Soup Series II (Chicken 'N Dumplings)" (1968).

Unlike paintings by artists where there is only one original, the majority of the Warhol images at issue here were produced in quantity. This was achieved, in general, through a silk screening process. In some cases, paintings were handpainted and hand screened, the work thus created through a screen such that at the end of the process both the painting and the screen existed. From the screen additional images were created, at times by Warhol himself and at times with the aid of a printer. In other cases, the images and screens were rendered on top of an existing photograph. At the end of the process, multiple copies of all works existed. The Plaintiffs consider all copies as originals.

Hughes testified that there were fifty forms of "Jackie III" created in oils and about one hundred prints created from silk screen. He was not certain whether the estate of Warhol had any of these at the time of his Warhol's death, but was certain that most, if not all, of the works in this series were sold to third persons, including museums.

Hughes testified that a number of "Electric Chair VII" were created through the silk screen process but that they were sold to the public.

He testified that 250 "Campbell's Soup Series II (Hot Dog Bean)" were created as silk screen as part of a portfolio, that there were ten Soups in a portfolio, and 250 portfolios made of ten totalling 2500 per set. There were two series of Soups and thus there are 5000 cans that have, for the most part, been sold to the public. Thus, this would apply to the second and third Soup cans proposed for use in the Design Look calendar, namely the untitled and the "Chicken 'N Dumplings."

"A Boy for Meg," Hughes testified, was a single painting that was sold outright, as was "And Now Let Us Praise Famous Men."

Hughes testified that three or four variations of 25 Colored "Marilyns" were done. No testimony was presented designating ownership of these works. As for "Marilyn," Hughes testified that there were approximately 20 different images of "Marilyn," and that each one was different from the other. He further testified that as with the Campbell's soup cans, portfolios were constructed with ten "Marilyns" each, and 250 portfolios were created. The "Marilyns" were also prints from silk screens. Hughes further testified that the "Marilyn" intended for use in the Design Look calendar is not owned by the Plaintiffs.

Hughes testified that Warhol created several unique self-portraits, each an independent canvas not created as a copy through the screening process. Hughes made no claim of ownership of the version selected for use by the defendants.

Hughes testified that "Green Coca-Cola Bottles" was an original work, that the work in question was one-of-a-kind, and that that work was not owned by the Plaintiffs.

The work referred to by the defendants as Untitled has been referred to in testimony as "Birmingham Race Riot." This work, Hughes testified, was a painting on canvas that included a silk screen. He testified that additional paintings were made from the screen on the original paint-

2. Since the works were created in the 1960s the Copyright Act of 1909 is applicable.

ing. Hughes further testified that he thought the estate held one of the images created from the silk screening, but that the others were sold.

None of the specific works in question have ever been used by Warhol himself to promote any products except that one Marilyn was used in the late 1970's in a Sony advertisement and another used by a Japanese advertising company in a calendar to promote its services. Campbell's Soup itself uses the soup can images to promote its products. Warhol works have been on constant display in museums and galleries, and are owned by those museums and galleries. They have been used to advertise exhibits and the like.

Design Look received permission to reproduce the works it intends to use in its calendar from the various museums and galleries that the works to be reproduced, the museums having provided Design Look with transparencies or various images. These works were sold outright to these institutions. The museums, however, have disclaimed responsibility for liability to another based on use.

Design Look has represented that it will provide a disclaimer on each calendar indicating that Plaintiffs are not the source, origin or sponsor of the calendar, and that they do not approve, sanction or consent to its publication. The proposed disclaimer would read: "Neither Andy Warhol, the Estate of Andy Warhol, Andy Warhol's Foundation for the Visual Arts, nor Andy Warhol Enterprises, Inc., are the origin or source of the Design Look Pop Art calendar, nor have they sponsored, sanctioned, approved its publication." The disclaimer will be on the back cover in 7 point print.

Several months after Warhol's death, Plaintiffs entered into an agreement with Schlaifer Nancy & Co., Inc. ("SNC"), a firm located in Atlanta, Georgia engaged in character and image licensing, granting SNC the exclusive right to license the use of Warhol's name as well as Plaintiffs' copyrights, registered marks, right of publicity and all other intellectual property rights belonging to Plaintiffs. SNC intends to exploit Warhol's art to promote various product lines, adhering to the statement reportedly to have been made by Warhol that, "Being good in business is the most fascinating kind of art." Under the agreement with SNC, royalties from the SNC–Warhol projects are to be divided between the Estate and SNC. All of the royalties flowing to the Estate are for the sole benefit of the Foundation.

One item of merchandise that is currently being developed by SNC is a 1989 calendar containing reproductions of certain of Warhol's works of art, including the Marilyn Monroe and Campbell's Soup works, and using Warhol's name and visual image. SNC was already working on this calendar prior to learning of Design Look's proposed calendar. The calendar developed by SNC will be published by Harry N. Abrams, Inc. ("Abrams"). These calendars will be sold to the same type of retail outlets at approximately the same price as those produced by Design Look.

*Conclusions of Law*

According to the Plaintiffs, except for SNC, no person, co·poration or other organization, including but not limited to any museum which owns works of art by Warhol or in which works of art by Warhol have been displayed, has ever been granted the right to license the use of Warhol's name or Plaintiffs' copyrights, registered works, right of publicity or other intellectual property right belonging to Plaintiffs and that other than SNC, no one has the right to reproduce an image created by Warhol. They thus assert causes of action against Design Look under § 43(a) of the Lanham Act, under New York General Business Law § 368–d, and for common law unfair competition.

Design Look, on the other hand, contends that since the works it intends to use are uncopyrighted and have not been used to promote products, they are in the public domain and the Plaintiffs can assert no right to protection. It further claims that if there is any right to protection, the right belongs to the owners from whom the works were duly licensed.

*The Standard for Preliminary Relief*

A district court may grant a preliminary injunction upon a showing of

"both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor."

*Charles of the Ritz Group v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1320 (2d Cir.1987) (quoting *Stormy Clime, Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 973 (2d Cir.1987)). In this case, the Plaintiffs have conceded that the works in question are not protected by copyrights and are not registered as trademarks. They assert protection under section 43(a) of the Lanham Act and New York's anti-dilution statute, N.Y.Gen.Bus.Law § 368–d. They additionally claim common law unfair competition.

*Lanham Act*

■ Section 43(a) of the Lanham Act is a broad section proscribing "false designation of origin" with respect to goods and services. 15 U.S.C. § 1125(a); *see Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1220 (2d Cir.1987). The Lanham Act provides protection to trademarks regardless of registration. Moreover, trademark protection may be asserted in the absence of a valid copyright. The right asserted is a property right that stems from use of the mark symbolizing "a product or business in the public mind." *Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing*, 510 F.2d 1004, 1014 (5th Cir.1975), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

The owner of a mark can claim protection under section 43(a) of the Lanham Act, if it can prove that "the use of its trademark by another, is likely to confuse consumers as to the source of the product." *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987). Indeed, "[i]n trademark cases, '[i]n the preliminary injunction context, a showing of likelihood of confusion as to source or sponsorship establishes the

requisite likelihood of success on the merits as well as risk of irreparable harm.'" *Id.* (quoting *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir.1982)).

However, Plaintiffs cannot claim entitlement to Lanham Act protection unless they can establish that they indeed hold valid trademark rights in the twelve works in question. *Frederick Warne & Co. v. Book Sales Inc.*, 481 F.Supp. 1191, 1195 (S.D.N.Y.1979). The Lanham Act defines a trademark as:

any word, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127, *quoted in Silverman v. CBS, Inc.*, 632 F.Supp. 1344, 1355 (S.D.N.Y.1986).

The use of a mark to identify goods or services is crucial. As this court has stated:

Trademark rights do not exist in the abstract, to be bought and sold as a distinct asset. They exist only in connection with a business or a product and can be transferred only along with that product or business or its goodwill. The Supreme Court has explained:

The asserted doctrine is based upon the fundamental error of supposing that a trademark right is a right in gross or at large.... There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.... [T]he right to a particular mark grows out of its use, not its mere adoption, its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

*Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 922 (S.D.N.Y.1983) (quoting *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918)), *aff'd,* 746 F.2d 112 (2d Cir.1984).

In *Universal City Studios* this court addressed the question of whether trademark rights could be transferred without transferring an entire business and hence the goodwill associated with it. Here, however, there was no mark created to transfer. No evidence was presented to show that any of these twelve images had ever been associated with any product or service put out by Warhol. Thus, no goodwill is associated with these particular images.

■ Plaintiffs contend that the fact that a Marilyn image was used in a Sony commercial in the late 1970's and that several Warhol images were licensed as part of a calendar to promote the commercial activities of a Japanese advertising firm constitutes use entitling these images to Lanham Act protection. First, the Plaintiffs have introduced no evidence to show that any of these images overlap with those Design Look proposes to use. Second, even if the images were the same, this limited use would be insufficient to establish a trademark.

■ Unlike a copyright, which stems from conception and reservation of rights, "[t]rademark protection [under the Lanham Act] arises from the adoption *and use* of a distinctive mark." *Silverman, supra,* 632 F.Supp. at 1356 (emphasis added).

> A trademark is deemed abandoned "[w]hen its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment." ... Temporary suspension of use of a mark due to circumstances beyond the owner's control may not result in abandonment.... But, self-serving statements of intent to resume at some indefinite future time will not prevail over objective evidence of abandonment.

*Id.* at 1357 (quoting 15 U.S.C. § 1127). The evidence adduced at trial, that Warhol used some images—not the ones in issue here—to sell products on two occasions, is not sufficient to overcome the inference of abandonment.

Plaintiffs additionally rely in part on *Allen v. National Video, Inc.,* 610 F.Supp. 612 (S.D.N.Y.1985) to claim protection for the mark "Andy Warhol" and the images he created. However, *Allen* involved the use of a Woody Allen look alike on a poster to endorse the defendants' video products and services. Here, there is no claim that Design Look intends to use Warhol as an endorsement. In fact, the disclaimer denies any endorsement from Plaintiffs.[3] Additionally, the works depicted in the calendar are not false replicas of Warhol images, but prints of the images themselves.

Further, Design Look does not intend to promote its calendar with the words "Andy Warhol." It specifically changed the name of its product to "Pop Art" to avoid use of any mark attached to the Warhol name.

■ As stated, the works themselves in issue were not used for commercial as opposed to artistic purposes. In fact, Warhol sold these images outright, in some cases without retaining a copy. Vincent Paul Freemont, the executive manager of Andy Warhol Studio, Secretary–Treasure and Director of the Foundation, and Vice–President and Secretary–Treasurer of Andy Warhol Enterprise, testified that the Plaintiffs had retained no rights to the uncopyrighted works that he was aware of. He testified further that it was his belief that the Plaintiffs would retain rights by virtue of the fact that Warhol created the image.

However, such is not the current state of the law. Senators Kennedy and Markey have proposed a federal amendment to the copyright law that would offer greater protection to artists. *See* Visual Artists Rights Amendment of 1986, S. 2796, 99th Cong., 2d Sess. That law would, among other things, provide resale royalties to artists for works that have appreciated in value. Thus, under the proposed law, the

---

**3.** The subject of disclaimers will be discussed in greater detail below.

creator of a work could assert some control or rights over his works after sale. Nonetheless, that protection, at this moment, is inchoate. Now, to maintain control over one's works of art, such a right must be reserved upon sale. In fact, in form contracts experts recommend expressly retaining these rights when selling art pieces. *See* 2 A. Lindey, Entertainment Publishing & the Arts: Agreements & the Law 532, form 9:03.01 (cum.supp.1977).

■ Thus, the rights asserted by Plaintiffs in this case, are rights which have been sold. In fact, they are rights which have been sold en masse. Each of the images in question here have been sold to museums, galleries, and the public at large. This is akin to a mark that has become widely accepted as part of public usage. *Cf. Rossner v. CBS, Inc.*, 612 F.Supp. 334 (S.D.N.Y.1985) (the term "Goodbar" has become such a large part of the public usage due to vast exposure that its originator can no longer claim protection). Nothing prevents this multitude of third parties from doing with their property as they see fit.

Despite the fact that these particular works have not been used as marks, the Plaintiffs still claim protection because of the unique style of Andy Warhol, and because these images—particularly Marilyn and Campbell's Soup—have come to represent Warhol. However, there is no question but that the works were created by Warhol, and Design Look does not represent otherwise.[4] This is not the test. To prevail, Plaintiffs must show not that these images have come to signify Andy Warhol as the artist, but Plaintiffs as the source of the product—the calendars. *Frederick Warne & Co., supra*, 481 F.Supp. at 1195.

Identifying the source of the product by a mark is a question of secondary meaning, that is:

> "[t]he power of a name or other configuration to symbolize a particular business, product, or company...." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203 n. 5 (2d

Cir.1979). This is because "It is elementary that the function of a trademark is to indicate the origin of the products to which it is attached." *Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 269 (2d Cir. 1968).

*Universal City Studios, supra*, 578 F.Supp. at 923. As this circuit has stated, "someone seeking to establish secondary meaning must show that the purchasing public associates goods designated by a particular mark with but a single—although anonymous—source." *Centaur Communications, supra*, 830 F.2d at 1221.

■ Plaintiffs have not made any showing of secondary meaning. First, as stated above, these images were never used by Warhol or the Plaintiffs in association with the promotion of any goods or services. In addition, these works were sold outright with no retention of rights whatsoever, except perhaps in the mind of the creator and his affiliates. Indeed, there is no claim that a museum holding a Warhol work could not have created a calendar of pieces in the museum in which a Warhol was included. Third, there are literally thousands of originals of both Marilyns and Campbell's Soup cans in the hands of third parties with no showing of any reservation of rights in the creator.

■ Moreover, Design Look has represented that it will print a disclaimer on the back of the calendar. This circuit has held that disclaimers in themselves are not dispositive with respect to alleviating consumer confusion. *Home Box Office, supra*, 832 F.2d at 1315; *see also Charles of the Ritz, supra*, 832 F.2d at 1324. However, in light of the fact that the Plaintiffs have to date produced no similar products, indeed no products at all, bearing similar images, secondary meaning cannot be claimed. In the absence of secondary meaning, there is no question but that a claim of consumer confusion cannot be made out. Thus, an estimation of such confusion is unwarrant-

---

**4.** Indeed, as set forth above, Design Look would have called the calendar "Andy Warhol" but for

plaintiffs' objections.

ed.[5]

■ In truth, from all the evidence adduced at the hearing, it appears that the Plaintiffs are not attempting to protect an existing mark, but to protect a future mark. However, the fact that Plaintiffs have entered into agreements with SNC to produce similar products in the future does not afford them Lanham Act protection in the present.

Based on the findings and conclusions set forth above, Plaintiffs have not shown a likelihood of success on the merits. Additionally, they have now shown sufficiently serious questions going to the merits making them a fair ground for litigation. Even if they had, the balance of hardships tips in favor of Design Look. As set forth above, Design Look has expended substantial sums of money to produce its calendar and has taken a considerable number of orders for the work. Plaintiffs, however, have not introduced evidence that they will suffer any injury, economic or otherwise, if the injunction does not issue. Thus, the balance of hardships favors Design Look, and Design Look will not be enjoined on the basis of the Lanham Act.

*Unfair Competition*

■ Plaintiffs' next claim protection based on the common law of unfair competition. This circuit has stated that:

unfair competition is now held to encompass a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another.... "[O]ne cannot sell his product by misappropriating the good will of another through misleading the public into thinking that it is 'sponsored' by or derived from something else." ... Yet, liability in this area

for misimpression or misappropriation has been limited. For example, one can capitalize on a market or fad created by another providing that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor.

*American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 662 (2d Cir. 1979) (quoting *Ideal Toy Corp. v. Kenner Products Division of General Mills Fun Group, Inc.*, 443 F.Supp. 291, 305 (S.D.N.Y.1977) (citations omitted)), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

The Plaintiffs have not made out a claim for unfair competition. They have no competing business or product good will upon which Design Look can capitalize on. As set forth above in the Lanham Act context, consumers are unlikely to be confused as to the source of Design Look's products because no similar products, indeed no products, have been put forth by the Plaintiffs to date. Additionally, the fact that so many works are in the hands of third parties who may use the images they own to promote such things as exhibits makes it just as likely that the consuming public would believe that the calendar was published by a museum or an art book company licensed by a museum. Thus, Plaintiffs have failed to state a claim for unfair competition.

*New York General Business Law § 368–d*

■ To make out a claim under § 368–d, a plaintiff must not only show that his mark has secondary meaning, but that the alleged infringing or offensive use dilutes the original mark. *Miss Universe, Inc. v. Patricelli*, 753 F.2d 235, 238

5. To determine likelihood of confusion, a court must examine the *Polaroid* factors. These are:

the strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the owner will bridge the gap, actual confusion, and the reciprocal of the defendant's good faith in adopting its own mark, the quality of the defendant's product, and the sophistication of the buyers.

As stated above, the "mark" in question is essentially nonexistent; there is no proximity between products as Plaintiffs have to date no such products; plaintiffs may bridge the gap with the Abrams Calendar; there is no showing of actual confusion; there is no showing that Design Look acted in bad faith, and indeed, it acted in good faith by obtaining the licenses it thought appropriate; there has been no showing that Design Look's calendar is of inferior quality; and there has been no evidence produced regarding sophistication of the buyers. On the strength of satisfying one factor, bridging the gap, relief cannot issue.

(2d.Cir.1985). " 'Typically, dilution is characterized as a "whittling down" of the identity or reputation of a tradename or mark.' " *Id.* (quoting *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983)).

It has already been established that these images did not constitute a mark at all. However, even if that were the case and the Warhol reputation itself were at stake, the Plaintiffs have produced no evidence to prove that Design Look's use of Warhol images will in any way dilute those works. Indeed, the calendar purports to celebrate, not undervalue, the work of this artist. In the absence of proof of a blurring or tarnishing of the Warhol reputation, no claim is stated under § 368–d. Thus, no relief is in order under this provision.

*Conclusion*

Based on the foregoing, the Plaintiffs have not shown a likelihood of success on the merits, nor have they presented sufficiently serious questions going to the merits to make them a fair ground for litigation. It is thus unnecessary to address the question of irreparable injury. The Plaintiffs' motion for a preliminary injunction is denied.

It is so ordered.