**AMERICAN ECONOMY INSURANCE COMPANY, et al., Plaintiffs,**

**v.**

**REBOANS, INC., et al., Defendants.**

**No. C 92–4341 BAC.**

United States District Court, N.D. California.

May 2, 1994.

---

### ORDER

CAULFIELD, District Judge.

Plaintiff American Economy Insurance Company and American States Insurance Company (hereinafter referred to collectively as "American States") filed this action seeking a declaratory judgment that it has no duty to defend or indemnify its insured, Reboans, Inc. or Reboans, Inc.'s subsidiary stores, Nikaido, Heiseido, and America–Ya, in an action filed against them, their sole shareholder Charles W. Bogar (Reboans, Inc., Mr. Bogar and the stores are hereinafter referred to collectively as "Reboans"), and his wife Jo Ann Bogar by Hunting World, Incorporated ("the underlying action"). This matter comes before the court on the parties' cross-motions for summary judgment. After careful consideration of the parties' oral and written arguments, American States' motion for summary judgment is GRANTED, and Reboans' motion is DENIED.

### BACKGROUND

A. *Factual History*

Charles W. Bogar is the sole shareholder of Reboans, Inc. Reboans, Inc. and its subsidiary retail stores, Nikaido, Heiseido, and America–Ya, specialize in the import, export, and retail sale of famous brand name merchandise, catering especially to Japanese tourists. On April 22, 1992, Hunting World filed suit in federal district court against Reboans, alleging that Reboans was selling counterfeit Hunting World products. The first amended complaint sets forth six causes of action against Reboans: federal trademark infringement, federal trademark coun-

terfeiting, and false representations and designation of origin in violation of the Lanham Act, 15 U.S.C.A. §§ 1114(1) & 1125(a) (West 1963 & Supp.1993); violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961–1968 (West 1984 & Supp.1993); unfair competition in violation of Cal.Bus. & Prof.Code § 17202 (Deering 1976 & Supp.1992); and injury to business reputation and dilution in violation of Cal. Bus. & Prof.Code § 14330 (Deering 1976 & Supp. 1992). There is also a cause of action pleaded against Mr. Bogar and his wife for fraudulent transfer in violation of Cal.Civ.Code §§ 3439–3439.12 (Deering 1984 & Supp.1992).

Reboans had purchased a commercial general liability ("CGL") insurance policy from American States in 1989, and on May 4, 1992, Reboans tendered its defense costs in the Hunting World lawsuit to American States. American States rejected the tender on July 2, 1992, and Reboans sought reconsideration. American States again denied coverage, and then filed this declaratory relief action.

### B. *The Policy Provisions*

Under the policy, American States is obligated to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury,'" and "to defend any 'suit' seeking those damages."

Advertising injuries must arise out of an enumerated offense committed in the course of advertising the insured's goods, products, or services. The policy enumerates the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

The policy also lists some explicitly excluded offenses, none of which are relevant to this case.

## LEGAL STANDARD

Where the interpretation of a writing is at the heart of a dispute, the question is one of law. *Allstate Ins. Co. v. Miller,* 743 F.Supp. 723, 724 (N.D.Cal.1990). Under California law, insurance contracts are construed so as to give effect to "the mutual intention of the parties at the time the contract [was] formed." *AIU Ins. Co. v. Superior Ct.,* 51 Cal.3d 807, 821, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990). In determining whether the parties intended an insurance policy to cover specific acts, courts look first to the language of the policy, reading terms in context and in their "ordinary and popular sense." *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992) (quoting Cal.Civ.Code § 1644); *accord AIU Ins. Co.,* 51 Cal.3d at 822, 274 Cal.Rptr. 820, 799 P.2d 1253. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal.Civ.Code § 1637 (Deering 1971). If the language is ambiguous or involves an absurdity, courts interpret the language "in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Cal.Civ.Code § 1649 (Deering 1971) (*quoted in Bank of the West,* 2 Cal.4th at 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545). "This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, the 'objectively reasonable expectations of the insured.'" *Bank of the West,* 2 Cal.4th at 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545 (quoting *AIU Ins. Co.,* 51 Cal.3d at 822, 274 Cal.Rptr. 820, 799 P.2d 1253). If all else fails, courts resolve ambiguities in favor of coverage. *Id.*

An insurer's duty to defend attaches whenever the facts of the underlying lawsuit "reveal a possibility that the claim may be covered by the policy." *Horace Mann Ins. Co. v. Barbara B.,* 4 Cal.4th 1076, 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993). Once the "duty attaches, the insurer is obligated to defend against all of the claims involved in the action, both covered and noncovered, until the insurer produces undeniable evidence supporting an allocation of a specific portion

of the defense costs to a noncovered claim."
*Id.*

## DISCUSSION

### A. Is Trademark Infringement the Misappropriation of an Advertising Idea or Style of Doing Business?

Reboans and American States agree that the relevant enumerated offense for consideration is "misappropriation of advertising ideas or style of doing business."[1] Because the policy does not define "misappropriation," "advertising ideas," or "style of doing business," Reboans argues that the phrase is ambiguous, and that an objectively reasonable insured could expect it to include trademark infringement. American States responds that a term is not ambiguous just because it is undefined, and that even if the scope of the phrase might be uncertain in some situations, it is not uncertain here. According to American States, "misappropriation" refers to the common law doctrine, which is inapplicable to trademarks, and "advertising ideas or style of doing business" refers to the mode of presenting a product to the public, and not the product itself. The court addresses each of these contentions below.

### 1. Does the Misappropriation Doctrine Apply to Trademarks?

■ The common law tort of misappropriation has three elements:

(1) Plaintiff has made a substantial investment of time, effort and money into creating the thing misappropriated such that the court can characterize that "thing" as a kind of property right.

(2) Defendant has appropriated the "thing" at little or no cost, such that the court can characterize defendant's actions as "reaping where it has not sown."

(3) Defendant has injured plaintiff by the misappropriation.

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 10.25 (3d ed. 1992) [hereinafter *McCarthy on Trademarks*]. The doctrine originated with the United States Supreme Court decision of *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). In that case, Association Press ("AP") sought to enjoin a competing wire service from using AP-generated news stories in East Coast papers to scoop AP subscribers on the West Coast. The Court held that AP had a quasi-property interest in "hot" news stories, which it could assert against its competitors.

American States points to this history, and argues that the purpose of the misappropriation doctrine is to protect quasi-property interests not already protected by more traditional theories of intellectual property law. *Accord McCarthy on Trademarks* § 10.23 (3d ed.1992). As such, the doctrine has no place in the field of trademarks, which are already adequately protected. *Cf. Toho Co., Inc. v. Sears, Roebuck & Co.,* 645 F.2d 788, 794 (9th Cir.1981) (plaintiff "cites no cases extending the misappropriation theory to trademark infringement. We believe that California courts would refuse to make such an extension."). Because an objectively reasonable insured would expect coverage only for listed torts, and since common law misappropriation is inapplicable to trademarks, an objectively reasonable insured would not expect trademark infringement to be covered.

This conclusion rests upon an analysis of federal and state law and where they meet in the misappropriation doctrine. Federal unfair competition law preempts the misappropriation doctrine, at least to the extent that the doctrine would protect source-identifying property rights without a showing of confusion as to source. *See Sykes Laboratory, Inc. v. Kalvin,* 610 F.Supp. 849, 855–56 & n. 6 (C.D.Cal.1985). While explaining this holding requires the court to digress somewhat, the court believes discussion is important because state laws for right to publicity and dilution claims manage to co-exist peacefully

---

1. While this matter was under submission, a similar case was decided in the Western District of New York. *J.A. Brundage Plumbing & Roto-Rooter, Inc. v. Massachusetts Bay Ins. Co.,* 818 F.Supp. 553 (W.D.N.Y.1993). The court in that case held that trademark infringement was *both* a misappropriation of an advertising idea *and* an "infringement of title or slogan." The parties did not advance this argument, and the court offers no opinion on it.

with federal trademark and trade dress law. *See, e.g., White v. Samsung Electronics Am., Inc.,* 971 F.2d 1395 (1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993); *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 305 (9th Cir.1992); *Golden Door, Inc. v. Odisho,* 646 F.2d 347, 352 (9th Cir.1980). Dilution and right to publicity claims do not require confusion as to source, even though the property rights at issue can also be protected under the Lanham Act, so how is the misappropriation doctrine distinguishable?

■ The distinction, the court believes, stems from the different interests protected by the respective unfair competition doctrines. The Lanham Act has two main purposes: "to 'secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.'" *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. ——, ——, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992) (quoting *Park 'N Fly v. Dollar Park and Fly, Inc.,* 469 U.S. 198, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985)). Accordingly, the Act will grant a limited property right in words or styles to a putative trademark or trade dress owner if he can show that doing so will foster those two goals. *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919 (9th Cir.1980) ("A trademark is, of course, a form of business property. But the 'property right' or protection accorded a trademark owner can only be understood in the context of trademark law and its purposes. A trademark owner has a property right only insofar as is necessary to prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods.").

■ While right to publicity and dilution also protect those two goals, they protect supplementary ones as well. For example, the right to publicity doctrine recognizes that a celebrity's persona is his or her product, so that taking a celebrity's persona and using it for commercial gain is little different from stealing a manufacturer's product and selling it, whether or not there is actual confusion as to sponsorship. *See, e.g., White v. Samsung Electronics Am., Inc.,* 971 F.2d 1395 (1992),

*cert. denied,* — U.S. ——, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993); *Eastwood v. Superior Court,* 149 Cal.App.3d 409, 198 Cal.Rptr. 342 (1983). Right to publicity laws also protect the intrusion into one's privacy that comes from having one's identity used in a manner with which one disagrees. *E.g., Tom Waits v. Frito-Lay, Inc.,* 978 F.2d 1093 (9th Cir.1992). Thus the tort compensates plaintiffs for injuries to feelings of peace and happiness, as well as for economic losses. *Id.* at 1103.

■ California's dilution laws also recognize that the value of a very strong trademark can be whittled away over time, even though no one particular reference to the mark causes consumer confusion. *McCarthy on Trademarks, supra,* at § 24.13. Dilution laws do not require a plaintiff to show confusion as to source, so long as he can show (1) that his trademark is strong, *see, e.g., Accuride Int'l, Inc. v. Accuride Corp.,* 871 F.2d 1531, 1539 (9th Cir.1989), and (2) that it has been associated with something unsavory, *e.g., Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 793 (9th Cir.1981); *McFly Inc. v. Universal City Studios, Inc.,* 228 U.S.P.Q. (BNA) 153, 161 (C.D.Cal.1985).

■ Dilution and right to publicity laws do not require a showing of confusion as to source because that is not the harm at which the laws are aimed. At the same time, the laws do not undermine Congress's goals in enacting the Lanham Act. Dilution and right to publicity laws do not promote consumer confusion or eliminate a trademark owner's ability to secure the value of the mark's goodwill. Their operation does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 479, 94 S.Ct. 1879, 1885, 40 L.Ed.2d 315 (1974), *quoted in G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.,* 958 F.2d 896, 903–04 (9th Cir. 1992). Accordingly, they are not preempted. *See Golden Door, Inc. v. Odisho,* 646 F.2d 347, 352 (9th Cir.1980).

■ Common law misappropriation is different. Its sole purpose is to create quasi-property rights, and Congress has stated

that a person has a property right in a word or style—things that would otherwise be subject to a First Amendment challenge—only if the word or style is distinctive and another's use of it would likely cause consumer confusion. "If there can be such a thing as 'misappropriation' of another's trademark, irrespective of distinctiveness and likelihood of buyer confusion, then a big step has been taken to wipe out the law of trademarks." *McCarthy on Trademarks, supra*, at § 10.-34[2]; *see Famolare, Inc. v. Melville Corp.*, 472 F.Supp. 738 (D.Haw.1979), *aff'd without op.*, 652 F.2d 62 (9th Cir.1981); *Diversified Marketing, Inc. v. Estee Lauder, Inc.*, 705 F.Supp. 128 (S.D.N.Y.1988). Recognizing a property right in an advertising idea or style of doing business that would not be protected under the Lanham Act would undermine the "purposes and objectives of Congress." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479, 94 S.Ct. 1879, 1885, 40 L.Ed.2d 315 (1974). Accordingly, it cannot be done.

 Why does the policy cover only the common law tort of misappropriation if the word "misappropriation" is often used by courts in trademark cases? See, e.g., *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, —— n. 15, 112 S.Ct. 2753, 2764 n. 15, 120 L.Ed.2d 615 (Stevens, J. concurring in the judgment) (quoting S.Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946)); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949 (D.C.Cir.1993); *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d at 305; *Vuitton v. White*, 945 F.2d 569, 570 (3d Cir.1991); *International Kennel Club of Chicago v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir.1988); *Prufrock Ltd. v. Lasater*, 781 F.2d 129, 131 (8th Cir.1986). These cases do not stand for the proposition that common law misappropriation applies to trademarks. Rather, their authors are simply using the word "misappropriation" in its ordinary and popular sense—as a synonym for "to take wrongfully."

American States argues that the word "misappropriation" refers to the common law doctrine of *Associated Press*. The court agrees. Although "misappropriation" has been used as a synonym for "infringement,"

the word has the clear meaning discussed above.

### 2. Is a Trademark an Advertising Idea or Style of Doing Business?

 American States' second argument is that trademarks are not advertising ideas or styles of doing business. Rather, those terms refer to the manner or method of presenting a product to the public. This distinction deserves further discussion. Where, exactly, should one draw the line between a safari theme, an elephant theme, and a particular elephant design?

> A trademark is but a species of advertising, its purpose being to fix the identity of the article and the name of the producer in the minds of the people who see the advertisement, so that they may afterwards use the knowledge themselves and carry it to others having like desires and needs for such article.

*Northam Warren Corp. v. Universal Cosmetic Co.*, 18 F.2d 774 (7th Cir.1927), *quoted in McCarthy on Trademarks, supra*, at § 3.05. *See also Black's Law Dictionary* 55 (6th ed. 1990) (defining "Advertise").

 The line separating mere advertising ideas from trademarks is at the point where consumers become confused as to source. The two cases cited by American States as falling within the policy's provisions, *Van Rensslaer v. General Motors Corp.*, 223 F.Supp. 323, 327 (E.D.Mich.1962), *aff'd*, 324 F.2d 354 (6th Cir.1963), and *Prufrock Ltd. v. Lasater*, 781 F.2d 129, 131–32 (8th Cir.1986), highlight an analytical problem. In both cases, the court held that the plaintiff did *not* have a protectable property interest. *See also McCarthy on Trademarks* at § 8.01[4] ("mere marketing theme or style of doing business is not protectable") (citing *Alberto–Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705 (7th Cir. 1972); *Haagen–Dazs, Inc. v. Frusen Gladje, Ltd.*, 493 F.Supp. 73 (S.D.N.Y.1980); *Murphy v. Provident Mut. Life Ins. Co.*, 756 F.Supp. 83 (D.Conn.), *aff'd*, 923 F.2d 923 (2d Cir.1990); *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244 (8th Cir. 1990); *Revlon, Inc. v. Jerell, Inc.*, 713 F.Supp. 93 (S.D.N.Y.1989); *Nature's Way Products, Inc. v. Nature–Pharma, Inc.*, 736

F.Supp. 245 (D.Utah 1990); *Hughes v. Design Look, Inc.*, 693 F.Supp. 1500 (S.D.N.Y. 1988)).

Misappropriation should be limited to its narrow, common law meaning. Although some courts have frequently used the term in its more general sense of "to take wrongfully," the phrase "misappropriation of advertising ideas" committed in the course of advertising the insured's products, as it is used in the CGL insurance policy, has an objective meaning which is not ambiguous.

### B. *What Were the Reasonable Expectations of American States and Reboans?*

American States argues that the evolution of its CGL policy shows that it did not expect the policy to cover trademark infringement. The language of American States' CGL policies are largely derived from forms drafted by the Insurance Services Office, Inc. ("ISO"), "an organization that develops standard forms for the insurance industry and collects statistical data and estimates risks relevant to the form," *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1262, 10 Cal. Rptr.2d 538, 833 P.2d 545 (1992). Until 1986, the standard ISO CGL form included "unfair competition" as a covered class of advertising injuries, and explicitly excluded injuries resulting from trademark, service mark, and trade name infringement. In 1986, ISO revised the standard form: unfair competition was eliminated in favor of misappropriation of advertising ideas and style of doing business, and the trademark, service mark and tradename exclusion was eliminated. As American States explains it, the trademark infringement exclusion had been necessary when the policy insured unfair competition claims, because "unfair competition" includes counterfeiting and trademark infringement. After unfair competition was replaced with misappropriation of advertising ideas and style of doing business, however, the exclusion was redundant, because one could not misappropriate a trademark. *Cf. FC & S Bulletin, Casualty and Surety,* "Personal and Advertising Injury Liability," Ab–1 to Ab–6 (The National Underwriter Co., Mar. 1990) (analyzing the 1986 changes to the standard ISO–CGL policy and concluding

that unfair competition *narrowly defined* as imitations "not amounting to an absolute counterfeit or to the infringement of a trademark or trade name" is much the same as misappropriation of advertising ideas or style of doing business). The court finds this interpretation to be objective, reasonable, and within the objectively reasonable expectations of the insured.

### C. *Do the Injuries at Issue in the Underlying Action Come Within the Terms of the Policy?*

 The policy covers enumerated offenses only to the extent that they were committed in the course of advertising the insured's goods, products, or services. In other words, the alleged "injury must have a causal connection with the insured's advertising activities before there can be coverage." *Bank of the West*, 2 Cal.4th at 1277, 10 Cal.Rptr.2d at 553, 833 P.2d at 560 (internal quotations omitted); *accord Everest and Jennings, Inc. v. American Motorists Ins. Co.,* 30 U.S.P.Q.2d 1534 (9th Cir.1994); *Iolab Corp. v. Seaboard Surety Co.,* 15 F.3d 1500 (9th Cir.1994); *National Union Fire Ins. Co. v. Siliconix, Inc.,* 729 F.Supp. 77, 79–80 (N.D.Cal.1989).

Reboans argues that, because a trademark is an advertisement, trademark infringement necessarily occurs in the course of advertising. The argument is overbroad. The trademarks at issue in this case "advertise" *Hunting World's* products—not Reboans'—and the policy only covers offenses committed in the course of advertising *Reboans'* goods.

Hunting World's injuries were caused by Reboans' selling counterfeit Hunting World goods, and those injuries did not occur "in the course of" Reboans' advertising activities. *See National Union Fire Ins. Co.,* 729 F.Supp. at 80; *Bank of the West*, 2 Cal.4th at 1275, 10 Cal.Rptr.2d 538, 833 P.2d 545. If Reboans were covered for advertising counterfeit goods in this case, then all counterfeiters would be covered for misappropriation of advertising ideas. The gravamen of the complaint is the counterfeiting of goods—not the advertising of *real* Hunting World goods or the misappropriation of a Hunting World

advertising idea or style of doing business for real goods. *See Aetna Casualty & Surety Co. v. Superior Court,* 19 Cal.App.4th 320, 23 Cal.Rptr.2d 442, 446 (4th Dist.1993) ("patentee is not injured because a product incorporating its invention is advertised, but because the infringer, without consent, used or sold a product utilizing a protected invention."); *Iolab Corp. v. Seaboard Surety Co.,* 15 F.3d at 1506 (9th Cir.1994) (same).

### D. *Duty to Defend.*

An insurer owes a broad duty to defend its insureds. *CNA Casualty of Cal. v. Seaboard Sur. Co.,* 176 Cal.App.3d 598, 605, 222 Cal.Rptr. 276 (1986). That duty is measured by the reasonable expectation of the insured, and must be assessed at the outset of the case. *See Fire Exch. v. Jiminez,* 184 Cal.App.3d 437, 441, 229 Cal.Rptr. 83 (1986). The duty to defend in this case "must be analyzed and determined on the basis of any potential liability arising from facts available to [American States] from the [Hunting World] complaint or other sources available to it at the time of the tender of defense." *CNA Casualty,* 176 Cal.App.3d at 605, 222 Cal.Rptr. 276. If it is determined that the insured "could not reasonably expect coverage and that no potential for liability existed under the policy," "the insurer had (and has) no obligation to defend or indemnify." *Everest and Jennings, supra,* 30 U.S.P.Q.2d 1534.

As described above, there is no potential of liability under the policy because the injuries complained of in the Hunting World complaint did not arise out of any advertising activity. Therefore, American States did not and does not have a duty to defend the claims in the underlying action.

### CONCLUSION

For all of the foregoing reasons, the court finds that the American States CGL policy does not cover any damages that Hunting World may prove it has suffered as a result of Reboans' use of Hunting World trademarks in Reboans' advertisements and store displays. There was no duty to indemnify or to defend. Accordingly, American States' motion for summary judgment is GRANTED and Reboans' motion for summary judgment is DENIED.

IT IS SO ORDERED.