**ADVANCE WATCH CO., LTD., Plaintiff,**

v.

**KEMPER NATIONAL INSURANCE CO. and Travelers Insurance Companies, Defendants.**

No. 94–CV–71918–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 28, 1995.

Mark Cantor and Maria Franek, Southfield, MI, for plaintiff.

Peter B. Kupelian, Matthew W. Schlegel, Southfield, MI, Thomas Holden, and William C. Morison–Knox, San Francisco, CA, for Travelers Ins.

George E. Petersmark, and Richard West, Detroit, MI, for Kemper Nat. Ins.

### ORDER

JULIAN ABELE COOK, Jr., Chief Judge.

This is an action to compel insurance coverage, in which the Plaintiff, Advance Watch Company (Advance), and the two Defendants, Kemper National Insurance Company (Kemper) and Travelers Insurance Companies, Inc. (Travelers), filed motions for summary judgment, Fed.R.Civ.P. 56, on October 12, 1994.[1]

For the reasons that have been set forth below, Kemper's motion will be granted, Travelers' motion must be denied, and Advance's motions are granted in part and denied in part.

I

In December 1992, Advance offered its writing pens in retail outlets across the United States on the basis of a contract with P.S.A./Pierre Cardin of Switzerland. This agreement granted Advance the exclusive right to use the Pierre Cardin trademark, as well as the stylized "PC" logo, on its pens. In late 1992 and early 1993, Advance created and published advertising material, including a sales catalog which contained pictures of its products.

On January 26, 1994, A.T. Cross Company and ATX International, Inc. (collectively "Cross") filed a lawsuit in this federal court, in which they charged Advance and Pierre Cardin[2] with trade dress, trademark, and common law trademark infringement, as well as unfair competition and dilution.[3]

---

1. Advance filed a separate motion for summary judgment against each Defendant. However, inasmuch as both of Advance's motions are substantively the same, the Court will evaluate them collectively.

2. The Cross lawsuit includes an additional party whose involvement is not essential to a resolution of the motions that are presently pending before this Court.

3. Paragraphs 16, 17, 21, 22, 27 and 31 of Cross's Complaint contain the following assertions:
    16. Advance.... has been and now is importing, advertising or offering for sale and selling throughout the United States, ... writing instruments having a trade dress, product design, and configuration which are reproductions, counterfeits, copies and colorable imitations of the CROSS writing instruments and which simulate the Cross Trade Dress and the Frusto–Conical Top Trademark.
    17. In addition, upon information and belief[,] defendant Advance, with the knowledge, approval and consent of defendant, Pierre Cardin, has caused to be printed, published and is now disseminating throughout the United States, ... a Pierre Cardin Writing Instruments catalog which, in the section entitled "Elite Collection", depicts the writing instru-

ments imported, advertised, offered for sale and sold by defendant, Advance, which are imitations of the CROSS writing instruments and which simulate the CROSS Trade Dress and the Frusto–Conical Top Trademark....
    ....
    21. Defendants' use of the Cross Trade Dress, including the Frusto–Conical Top Trademark, ... constitutes false designations of origin, false descriptions and false representations, and falsely represents to the public that defendants' writing instruments are CROSS writing instruments or that defendants and their writing instruments are authorized, endorsed, and/or sponsored by Cross or are connected in some way with Cross, and defendants, with knowledge of such falsity, have caused their writing instruments to enter into commerce.
    22. Plaintiffs are, and will be, damaged by the aforementioned false designations, false descriptions, and false representations in that the public is likely to be induced into dealing with defendants in the mistaken belief that defendants' writing instruments are Cross writing instruments, that defendants and their writing instruments are authorized by Cross, are endorsed by Cross, are sponsored by Cross and/or are connected in some way with Cross.
    ....

Advance had standard form Commercial General Liability (CGL) insurance policies with Kemper, covering the period between August 25, 1993 to August 25, 1994, and Travelers,[4] which was in effect from August 25, 1992 through August 25, 1993. These two policies required Kemper and Travelers to "pay those sums that the insured becomes legally obligated to pay as damages because of ... 'advertising injury' to which this coverage part applies." Policy at § I, coverage B(1)(a). Moreover, the insurers "have the right and duty to defend any 'suit' seeking those damages." *Id.* Section V of the policy defines an "advertising injury" as one which "aris[es] out of [among other things the] misappropriation of advertising ideas or style of doing business."

In February 1994, Advance informed Travelers and Kemper of the Cross lawsuit and requested insurance coverage under their respective insurance policies. On March 10, 1994, Kemper advised Advance that it would neither provide any defense nor assume any indemnification costs arising out of the Cross litigation. Travelers adopted the same position on April 5, 1994. On May 17, 1994, Advance initiated this lawsuit against Travelers and Kemper, alleging breach of contract and bad faith in its denial of insurance coverage.

## II

The primary question before this Court is whether the claims in the Cross Complaint constitute "advertising injury" which is covered by Kemper or Travelers. In order to find that Travelers or Kemper is obligated to defend Advance in the Cross action, the Court must conclude that (1) the underlying suit describes an injury which occurred in the course of advertising, (2) the "misappropriation of advertising ideas or style of doing business" encompasses Cross's claims against Advance, and (3) the policy was in effect at the time that the injury occurred.

In support of its position, Advance contends that Cross's claims for trademark and trade dress infringement fall within the rubric of "misappropriation of advertising ideas or style of doing business." Travelers counters that misappropriation only exists as a common law tort in the absence of a property right which is protected by traditional trademark or trade dress law. Moreover, it maintains that Cross's claims against Advance include, *inter alia,* trademark and trade dress infringement, neither of which are covered by the policy. It is Kemper's position that Cross's claims for injunctive relief, punitive damages, and exemplary damages are not covered by the policy. Kemper also avers that the conduct about which Advance complains occurred outside of the policy coverage dates and is, therefore, excluded.

## III

### A. *Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). A summary judgment shall be entered if the moving party demonstrates that there is no genuine issue as to any material fact, and if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202

27. Defendants have been and now are importing, advertising, offering for sale and selling ... writing instruments which are reproductions, counterfeits, copies and colorable imitations of the registered Frusto–Conical Top Trademark of plaintiff....

....

31. The acts and conduct of defendants averred herein constitute trademark and trade dress infringement in violation of the common law of the State of Rhode Island. As a result, defendants have been and now are being unjustly enriched by their misappropriation of the Cross Trade Dress, the Frusto–Conical Top Trademark and the goodwill symbolized thereby.

Cross Complaint at ¶¶ 16, 17, 21, 22, 27, 31.

4. The insurance industry generally uses standardized language in its general liability policies. Because these policies contain the same relevant language, any reference to a "policy" will apply to the Travelers and Kemper policies unless otherwise stated.

(1986). The failure of a party to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ..." will mandate the entry of summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This "burden on the moving party may be discharged by ... pointing out to the district court ... that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. In making this evaluation, the court is authorized to examine any documents (e.g., pleadings, depositions, answers to interrogatories, admissions, and affidavits) in a light that is most favorable to the non-moving party. *See Boyd v. Ford Motor Company,* 948 F.2d 283, 285 (6th Cir.1991).

Whenever the jurisdiction of a federal district court is based upon the diverse citizenship of the parties, as it is here, the choice of law rules of the state in which the court sits must be applied. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Colonial Refrigerated Transportation, Inc. v. Worsham,* 705 F.2d 821, 825 (6th Cir.1983); *Mahne v. Ford Motor Co.,* 900 F.2d 83, 85 (6th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 349, 112 L.Ed.2d 313 (1990). In the State of Michigan, courts reviewing cases which involve the construction of an insurance contract must apply the law of the state where the insurance policy was issued. *See Rubin v. Gallagher,* 294 Mich. 124, 128, 292 N.W. 584 (1940) ("validity and construction of a contract are controlled and to be determined by the laws of the situs, or the place where the contract was entered into"); *Insurance Co. of North America v. Forty–Eight Insulations, Inc.,* 451 F.Supp. 1230, 1237 (E.D.Mich.1978), *aff'd,* 633 F.2d 1212 (6th Cir.1980). Here, all of the parties agree that the insurance policies are governed by Michigan law.

## B. *Insurance Claims*

■ An insurance policy is a contract. Consequently, when a dispute arises between the parties, a court may evaluate the terms and conditions of the agreement in order to discern their intent. *Eghotz v. Creech,* 365 Mich. 527, 530, 113 N.W.2d 815 (1962). In interpreting the terms of the policy, a court must look to the agreement as a whole in a manner that will give meaning to all of its terms. *Fresard v. Michigan Millers Mut. Ins. Co.,* 414 Mich. 686, 694, 327 N.W.2d 286 (1982). Clear, unambiguous language is given its commonly understood meaning. *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 206–07, 476 N.W.2d 392 (1991) (clear, unambiguous language must be considered "in its plain and easily understood sense") (citation omitted); *see also Group Insurance Co. v. Czopek,* 440 Mich. 590, 597, 489 N.W.2d 444 (1992) (language not clearly defined is given commonly used meaning).

Where the language is unclear or its terms are ambiguous, the agreement is construed in favor of coverage for the insured. *Fresard v. Michigan Millers Mut. Ins. Co.,* 97 Mich.App. 584, 590, 296 N.W.2d 112 (1980), *aff'd,* 414 Mich. 686, 327 N.W.2d 286 (1982). In general, an insurer may limit its duties to the insured by (1) drafting its coverage to only include certain activities, or (2) explicitly eliminating specific events through an exclusionary clause. *Czopek,* 440 Mich. at 604, 489 N.W.2d 444.

■ In liability policies, the obligation of the insurer depends upon the allegations of the underlying complaint. *Detroit Edison Company v. Michigan Mutual Ins. Co.,* 102 Mich.App. 136, 141, 301 N.W.2d 832 (1980). The insurer only has a duty to defend the insured if the charges against the insured in the underlying action arguably fall within the language of the policy. *Allstate Ins. Co. v. Freeman,* 432 Mich. 656, 662, 443 N.W.2d 734 (1989). However, the terminology that was used by the underlying plaintiff in the complaint is not dispositive. Instead, the analysis of the issue must include the actual cause of the injury. *Id.* at 662–63, 443 N.W.2d 734. Any doubt as to the insurer's liability must be resolved in favor of the insured. *Detroit Edison,* 102 Mich.App. at 142, 301 N.W.2d 832. Moreover, where only some of the claims against the insured party are covered, the insurer must defend the whole claim until it becomes apparent that no recovery is pos-

sible under the covered theory. *Titan Holdings Syndicate v. Keene*, 898 F.2d 265, 269 (1st Cir.1990) (applying New Hampshire law and citing the majority rule).

The insurance policy at issue in this case provides for coverage of an advertising injury which is "caused by an offense committed in the course of advertising [the insured's] goods, products or services...." Policy at § I, coverage B(1)(b)(2). Because of this provision, a causal connection between the alleged injury and the advertising is clearly required for coverage. *See Iolab Corp. v. Seaboard Surety Co.*, 15 F.3d 1500, 1506 (9th Cir.1994); *J.A. Brundage Plumbing & Roto-Rooter v. Massachusetts Bay Ins. Co.*, 818 F.Supp. 553 (W.D.N.Y.1993) (servicemark infringement by use of mark in connection with advertising held to be advertising injury), *vacated by reason of settlement*, 153 F.R.D. 36 (W.D.N.Y.1994); *Sentry Ins. v. R.J. Weber Co.*, 2 F.3d 554 (5th Cir.1993) (copying and selling portion of company's lists did not constitute sufficient connection between infringement and advertising); *Noyes v. American Motorists Ins. Co.*, 855 F.Supp. 492, 493 (D.N.H.1994) (dispositive question is whether facts alleged in complaint fall within definition of advertising injury). If this requirement did not exist, there would be almost unlimited liability:

> Virtually every business that sells a product or service advertises, if only in the sense of making representations to potential customers. If no causal relationship were required between 'advertising activities' and 'advertising injuries,' then 'advertising injury' coverage, also, would encompass most claims related to the insured's business ... as a matter of common sense, an objectively reasonable insured would not expect 'advertising injury' coverage to extend to such lengths.

*Bank of the West v. Superior Court*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 553, 833 P.2d 545, 560 (1992).

In *American Economy Ins. Co. v. Reboans, Inc.*, 852 F.Supp. 875 (N.D.Cal.1994), the insured had been sued for allegedly selling counterfeit products. 852 F.Supp. at 877. The underlying plaintiff had asserted trademark infringement and false designation of origin, in violation of the Lanham Act. *Id.* at 877–88. A district court in California examined the applicable insurance language (similar to the pertinent provisions in the policy in the case at bar) and initially concluded that the trademark infringement claim in an underlying complaint was not covered by the policy. However, upon reconsideration, the court altered its position and ordered the insurer to pay the defense costs. *American Economy Ins. Co. v. Reboans, Inc.*, No. C–92–4341–DLJ (N.D.Cal. Dec. 27, 1994).

As in the instant case, the parties agreed that the relevant language to be interpreted was "misappropriation of advertising ideas or style of doing business." *Id.* 852 F.Supp. at 879. Similar to Advance's argument here, the insured in *Reboans* asserted that a trademark infringement necessarily occurs in the course of advertising because a trademark is an advertisement.[5] In finding that " '[s]tyle of doing business' expresses essentially the same term as the more widely used term: 'trade dress,' " [6] the Court held that it was

---

**5.** In its original determination, the court rejected this argument, asserting that any injury would occur by the selling of the infringing goods, and not in the advertisement of them. *See Reboans*, 852 F.Supp. at 882. It relied heavily upon a finding that the word, "misappropriation," was not intended to cover certain causes of action.

The court noted the history of the common law tort of misappropriation, which was originated in *International News Serv. v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). There, the Associated Press (AP) attempted to stop a competing wire service from using stories that it had generated. The court held that AP "had a quasi-property interest in 'hot' news stories, which it could assert against its competitors." 852 F.Supp. at 879. The court accepted the insurer's assertion that the purpose of the misappropriation doctrine is to protect quasi-property interests that are not already protected by the traditional theories of intellectual property law, thus precluding its application to trademarks, which are already protected. *Id.* (citing McCARTHY ON TRADEMARKS § 10.23 (3d ed. 1992); *Toho Co. Inc. v. Sears, Roebuck & Co.*, 645 F.2d 788, 794 (9th Cir.1981)).

**6.** Slip Op. at 18 (citing *Saint Paul Fire and Marine Ins. Co. v. Advanced Interventional Sys.*, 824 F.Supp. 583 (E.D.Va.1993), *aff'd* 21 F.3d 424 (4th Cir.1994)); *Brundage*, 818 F.Supp. 553, 558–59; *Noyes v. American Motorists Ins. Co.*, 855 F.Supp. 492 (D.N.H.1994); *Ross v. Briggs & Morgan*, 520 N.W.2d 432, 435–36 (Minn.Ct.App. 1994)).

objectively reasonable for Reboans to expect that the policy language would encompass a claim of trade dress infringement. Slip Op. at 19. The court concluded that because Reboans is potentially liable for trade dress infringement in the underlying suit, the insurer had a duty to defend it. *Id.* at 21.[7]

In *J.A. Brundage Plumbing v. Massachusetts Bay Ins. Co.*, 818 F.Supp. 553 (W.D.N.Y.1993), *vacated by reason of settlement*, 153 F.R.D. 36 (W.D.N.Y.1994), a New York district court also found coverage for allegations of trademark infringement. The insured in *Brundage* fraudulently represented that it was affiliated with Roto Rooter, a well-known plumbing company. The advertisement of those services, as well as the false representation in the advertisement, constituted allegedly infringing behavior. The court found that the trademark infringement amounted to a misappropriation:

> in the ordinary sense of these terms, misappropriation of an "advertising idea" would mean the wrongful taking of the manner by which another advertises its goods or services. This would include the misuse of another's trademark or trade name ... A trademark is defined under the federal statute as "any word, name, symbol or device or any combination thereof, adopted and used by manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127.... Similarly, one's mark and name is an integral part of an entity's "style of doing business." Such misappropriation of "style of doing business" would include trademark, trade name or servicemark infringement.

818 F.Supp. at 557. The court noted the historically strict construction of advertising injury liability coverage issues by New York courts, citing *A. Meyers & Sons Corp. v. Zurich American Insurance Group*, 74 N.Y.2d 298, 546 N.Y.S.2d 818, 545 N.E.2d 1206 (1989) and *Jerry Madison Enterprises, Inc. v. Grasant Manufacturing Co.*, 1990 WL 13290 (S.D.N.Y.1990) (denying coverage where advertising was unnecessary ingredient in copyright infringement or patent infringement claim), but determined that the facts were substantively different because the underlying claim complained that the "use by Defendants of the name and mark ROTO–ROOTER *in connection with the advertising* and sale of sewer, drain and pipe cleaning services, constitutes an infringement...." 818 F.Supp. at 558. The court held that this language "supplies the essential ingredient found missing in *Madison* and *Meyers*—i.e. injury arising out of advertising." *Id.*[8]

The facts in *Brundage* are slightly different than those in the case at bar. Here, it is the act of manufacturing and the design of the pen that allegedly infringes—not the description of the pen. Moreover, there is no contention that Advance is explicitly claiming a connection with Cross. Nevertheless, there is an accusation that Advance, through its sales promotions to the general public, has attempted to imply that its pens are the products of the A.T. Cross Company because of the similarity of design. Inasmuch as the catalog here arguably has the same effect as the "Roto Rooter" designation, the holding of *Brundage* is instructive, despite the failure of the court to address the issue of proximate causation in which the trademark or trade

---

7. In overturning its earlier decision, the court relied in part on *Clary Corp. v. Union Standard Ins. Co.*, 27 Cal.App.4th 1410, 33 Cal.Rptr.2d 486 (1994), which was ordered depublished. *See* 1994 Daily Journal DAR 18060 (Cal. Dec. 22, 1994). However, the portion of the opinion which discusses trade dress does not cite *Clary* and is not affected by its depublication.

8. The court also found the requisite causation in the remaining counts:
> [T]he use by Defendants of the designation ROTO–ROOTER in connection with the business of offering sewer and drain cleaning services, tends falsely to represent or designate

> that the Defendants are licensed, sponsored by or otherwise affiliated with Roto–Rooter ... which has damaged and is likely to continue to damage Roto–Rooter....
> [The use of the name ROTO–ROOTER] in connection with the sale offering for sale, and/or advertisement of sewer and drain cleaning services is likely to cause infringement, [and the] continued advertisement and sale of sewer and drain cleaning services ... under the ROTO–ROOTER designation constitutes a misappropriation of plaintiff's good will....

818 F.Supp. at 558.

dress is the actual appearance of the product. *Id.* at 557.

In *Noyes v. American Motorists Ins. Co.,* 855 F.Supp. 492 (D.N.H.1994), the plaintiff sought coverage in an underlying lawsuit in which he had been accused by another party with having intentionally infringed upon the trademark of another party by using the designation, "Dustfree Precision Pellets," for its food pellets for laboratory animals. *Id.* at 493. The insurer was directed to defend after the court found that the alleged infringement occurred as a result of the plaintiff's use of the designation in its advertisement. The court noted that "[b]ut for the use of the term in the packaging, literature and advertisements, there would have been no trademark infringement." *Id.* at 495. *Noyes,* despite its obvious factual differences, provides support for a finding of coverage in the instant cause. The appearance of the frusto conical top in the advertisement lends support to Cross's claim of trademark infringement, in that it could be construed as a false designation of origin.

While *Reboans, Brundage,* and *Noyes* lend support to Advance's theory, there are some cases which ostensibly support a finding that Cross's claims against Advance do not fall within the policy. For example, in *Sentry Ins. Mut. Co. v. Flom's Corp.,* 818 F.Supp. 187 (E.D.Mich.1993), a district court addressed the scope of coverage for an advertising injury arising out of an offense which allegedly occurred in the course of the insured's advertising activities. The plaintiff in the underlying civil suit sought damages, fees, and costs under antitrust laws for an alleged conspiracy to fix prices on dry cleaning and laundry supplies. *Id.* at 188–89. The insured argued that the antitrust claims were claims of unfair competition,[9] and, to the extent that he had advertised the allegedly fixed prices, the claims arose out of his advertising activities. *Id.* at 190. The court

granted a summary judgment to the insurer on the ground that the insured's offenses did not "arise out of" the advertising activities. *Id.* at 190–91.

In *National Union Fire Ins. Co. v. Siliconix, Inc.,* 729 F.Supp. 77 (N.D.Cal.1989), an insured party had been charged with patent infringement and sought coverage from the insurer for "advertising injury."[10] The insured, Siliconix, contended that because advertising is a part of selling, the sale of an infringing product is an act which occurred in the course of advertising. The court rejected this argument, noting that advertising, without more, does not constitute an actionable patent infringement since the infringing act is actually the "making, using, or selling of a patented invention, not the mere advertising of the invention." *Id.* at 79.

The underlying action in *Iolab Corp. v. Seaboard Sur. Co.,* 15 F.3d 1500 (9th Cir. 1994), was based on the production of an intraocular lens by the Iolab Corporation which Dr. Jensen, the underlying plaintiff, contended was an act of infringement upon his patent. The court noted that "unless Dr. Jensen's claim was that Iolab infringed his patent in its advertising, in a manner independent of its sale of the intraocular lens, the Jensen loss is not a form of privacy arising out of or committed in advertising and is not covered under the policies." *Id.* at 1506.[11] The court concluded that the alleged infringement of a patent on an intraocular lens design was not covered under the advertising injury provision:

> Had Iolab merely advertised the intraocular lens but not sold the product, [the patentee] could not have accused Iolab of infringing his patent. Since Iolab's advertising of the intraocular lens was not an element of Dr. Jensen's claim, Iolab could

---

9. The policy defined "advertising injury" as, *inter alia,* "piracy, unfair competition, or idea misappropriation, arising out of the insured's advertising activities and occurring during the policy period." *Flom's,* 818 F.Supp. at 191 (citation omitted).

10. The provisions of the policy are similar to the policies in the present case, but included the

offense of "piracy" occurring in the course of the insured's advertising activities. 818 F.Supp. at 191.

11. The policies in *Iolab* provided coverage for "acts of privacy arising out of or committed in advertising." 15 F.3d at 1502.

not reasonably have expected insurance coverage for its infringement.

*Id.* 15 F.3d at 1507.

These three cases (*Sentry, National Union* and *Iolab*), none of which expressly address the issue of trademark or trade dress infringement, are representative of the current state of case law that seek to interpret policy language. While they appear to support the Defendants' denial of coverage, each case is factually distinct. For example, in *Sentry,* the advertisements were incidental to the claims. Had there been no advertisement, the underlying complaint would have been identical. The advertising of the prices did not present a recoverable ground, and thus coverage was properly denied. On the other hand, the advertisement in the case at bar is directly connected to the underlying complaint. Cross explicitly identifies Advance's advertising in its complaint.

Nor is *National Union* instructive. In patent cases, there is no causal connection between the product is made and the manner in which it is advertised. The method of creation is not necessarily evident in or connected to the manner of the advertisement of the product. However, the product in trademark cases is indistinguishable to some extent from the advertisement. The allegation

that the pen incorporated the Cross trademark, coupled with evidence that the pen was displayed in the advertisements, creates a much stronger causal connection between the advertising activities and the trademark infringement claim, especially in those instances in which the underlying complaint explicitly requests relief for the advertisement of the allegedly infringing instruments.

In summary, these three cases are inapposite to the situation before this Court and, hence, are not persuasive because (1) the Cross claim contains an allegation that the advertisement itself is injurious, and (2) even if the pens were not sold but were merely advertised with the frusto-conical top, Cross could have a claim for the unauthorized use of its trademarked design.[12] In dicta, even the *Iolab* court held that "where the advertising and the infringing sales are merged, as in the sale of a patented product by mail order catalog, or where an entity uses an advertising technique that is itself patented," there might be coverage. *Id.* 15 F.3d at 1507, n. 5.

Thus, based on the available case law, it appears that the term, "misappropriation of style of doing business," though not ambiguous,[13] is broad enough to embrace claims that

12. Lawsuits for infringement of trade dress and trademark rights are brought under section 43(a) of the Lanham Act which provides the following in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or devise, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake ... as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. ...

shall be liable to a civil action by any person who believes that he is or is likely to be damaged by the use of any such act.

15 U.S.C. § 1125(a). This statute offers protection of trade dress and trademark rights from deceptive and unfair competition. *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. —, —, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992). The elements that are necessary for a claim of trade dress or trademark violation under section 43(a) are:

(1) ownership of a specific trademark or trade dress;

(2) continuous use of the trademark or trade dress;

(3) that the trademark, trade dress or product configuration of the competing products is confusingly similar; and

(4) that the trademark, trade dress or product configuration has obtained secondary meaning.

*See Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1105 (6th Cir. 1991); *Kwik-Site Corp. v. Clear View Mfg. Co.,* 758 F.2d 167, 178 (6th Cir.1985) (quoting *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444–45 (Fed.Cir.1984) (citing cases)). The Supreme Court has noted that an analysis of trademark and trade dress protection under section 43(a) should be treated the same. *Two Pesos,* — U.S. at —, 112 S.Ct. at 2760.

13. An appellate court in Wisconsin recently found that the undefined phrase, "misappropriation of advertising ideas or style of doing business," is broad enough to include the misappropriation of customer information and market strategy, but found that it is not ambiguous. In the same opinion, the court declined to agree with the assertion that the misappropriation of style of doing business is the same as infringe-

the insured copied a design explicitly protected by trademark. When these claims are found to arise out of advertising activity, the cases support a finding of insurer liability under policies similar to the one in this case.

■ When insurers fail to adequately indicate the scope of their coverage and the types of claims that are excluded, they leave themselves open to the interpretations of the courts and the parties. The language of the exclusions and coverage portions should be as concise and comprehensible as possible.[14] As much as it is the duty of the insurer to clearly delineate the lines of coverage and exclusion if there is no connection between the advertising and the injury, courts should not find coverage under these defense provisions merely because of advertising by the insured at the time of the injury. In order for the insurance to apply, the injury should have a direct connection to, and result from, the advertising. To hold otherwise would constitute an expansion of liability that was not intended by the parties.

The situation here does not expand liability beyond that which was contemplated by the parties on the basis of the language within the policy. Travelers argues that "the parties cannot have intended to cover trademark and trade dress infringement in such a roundabout manner, by leaving out these well-known legal terms of art and then providing coverage by naming a different common law offense ... To suggest that the parties meant 'trademark infringement' when they said "misappropriation" is absurd." (Traveler's Reply at 3–4.) However, this argument is not convincing because the reverse (to wit, that the parties did not explicitly exclude these well-known legal terms of art despite an intent not to cover such claims) would produce an illogical result. In the underlying complaint for which coverage is at issue, Cross explicitly challenges Advance's advertisement of the allegedly infringing writing instruments. *See e.g.,* Cross Complaint at ¶¶ 16–17. Moreover, the trade dress and trademark infringement claims arguably arise, at least in part, from Cross's publication of the advertisement catalog which depicts the picture of the allegedly similar pen. Arguably, Cross would be able to state a valid claim against Advance even if it had not sold the pens which allegedly infringed on the trademark if the advertisement was found to have falsely designated a connection with Cross. Accordingly, Cross's claims of trademark and trade dress infringement, as they relate to the publication of Advance's catalog, (1) constitute a misappropriation of a style of doing business, and (2) arise out of advertising activities, and thus fall within the coverage provisions of the policy.

### C. *Exclusion from Coverage*

■ Kemper contends that coverage is precluded by the provision which indicates that coverage for injuries "arising out of oral or written publication of material whose first publication took place before the beginning of the policy" is excluded because Advance initially offered its pens for sale to the general public in December 1992 and published its first sales promotion catalog in January 1993. The effective period of insurance did not begin until August 25, 1993.

ment of trade dress. However, the court limits the applicability of that statement by declaring that a "style of doing business could qualify for protection as trade dress, but only if it is either inherently distinctive or has acquired distinctiveness, and only if there is a likelihood of confusion." *Atlantic Mutual Ins. Co. v. Badger Medical Supply Co.,* 528 N.W.2d 486, (Wisc.App. 1995) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. ——, ——, 112 S.Ct. 2753, 2755, 120 L.Ed.2d 615, 621 (1992)). It is important to note that as of January 24, 1995, this opinion had not been released for publication in the permanent law reports and, as a result, it is subject to revision or withdrawal.

**14.** The 1982 Broad Form Endorsement, the predecessor to the 1986 Commercial General Liability Policy form which was used for the policies between Advance and the Defendants, specifically stated that the policy "does not apply ... to advertising injury arising out of ... (b) infringement of trademark, service mark, or trade name, other than titles or slogans, by use thereof or in connection with goods, products, or services, sold, offered for sale, or advertised ..." Susan J. Miller & Philip Lefebvre, Miller's Standard Insurance Policies Annotated 436 (1989). By dropping the trademark exclusion in the 1986 CGL policy, it appears that the insurance companies intentionally broadened their coverage to include such claims.

In rebuttal, Advance argues that although some of the alleged offending conduct revolves around its publication of the written advertising material, the tort alleged by Cross is an ongoing one, and the underlying lawsuit was filed during the term of the Kemper policy. This argument has no merit. It is the picture and description of the pen with its alleged look-alike Cross design in the catalog and advertising materials for which Advance is covered. Moreover, the policy is clear and Advance offers no argument to counter its explicit terms. In a motion for summary judgment, an adverse party may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Here, Advance, who bears the burden of proving that the Cross action is covered by the policy, has not presented any evidence to counter Kemper's contention that the publication of the catalog which caused the claimed advertising injury preceded the effective date of the insurance. Accordingly, Kemper's motion for summary judgment shall be granted.

### D. *Attorney Fees and Costs*

Advance asserts a claim for Travelers' and Kemper's "bad faith" action in denying coverage. However, it concedes that there is no independent basis or for liability or damages under Michigan law. In *Stockdale v. Jamison,* 416 Mich. 217, 330 N.W.2d 389 (1982), the Michigan Supreme Court addressed the interplay between an insurer's duty to defend and a claim of bad faith:

> The duty to defend, however, arises solely from the language of the insurance contract. A breach of that duty can be determined objectively, without reference to the good or bad faith of the insurer. If the insurer had an obligation to defend and failed to fulfill that obligation, then, like any other party who fails to perform its contractual obligations, it becomes liable for all foreseeable damages flowing from the breach.

*Id.* at 224, 330 N.W.2d 389. The court concluded that "we do not see any justification ... or any reason why [an insurer] should not be held to be responsible, just as any other party to a contract who fails to perform it, for all the loss arising naturally from the breach." *Id.* at 226, 330 N.W.2d 389. However, while an action to compel coverage is arguably a foreseeable damage flowing from the breach, "the established rule in Michigan is that the insured may not be allowed attorneys' fees in excess of taxable costs for the declaratory action to enforce insurance coverage." *Iacobelli Constr. Co. v. Western Cas. & Sur. Co.,* 130 Mich.App. 255, 267, 343 N.W.2d 517 (1983). *See also Schiebout v. Citizens Ins. Co.,* 140 Mich.App. 804, 814, 366 N.W.2d 45 (1985) (award of attorney fees in excess of taxable costs in action to enforce insurance coverage not allowed in absence of court rule or statute to the contrary) (citations omitted). Accordingly, Advance is entitled to (1) the taxable costs from Traveler's in this action, and (2) defense and possible indemnification in connection with the Cross action.

### IV

Accordingly, Kemper's motion for summary judgment is granted, and Advance's claims against Kemper are dismissed. However, Advance has proven its claim against Travelers, and its motion against Travelers for summary judgment is granted. Travelers must fulfill its contractual obligations to Advance as set forth in this opinion, and is liable to defend Advance in the Cross action as long as potential grounds for recovery of injury arising from the advertising of the writing instruments remain. In addition, Travelers must reimburse Advance for all past payments of attorneys fees and costs incurred in its defense of the Cross action, as well as for the taxable costs for this action, upon submission and approval of Advance's bill of costs.

IT IS SO ORDERED.